## In re PURSUE ENERGY CORPORATION.

### No. 02–05339 JEE.

United States Bankruptcy Court,
S.D. Mississippi,
Jackson Division.

Feb. 3, 2006.

---

ments thereto, and the motion for administrative expenses filed by the Mississippi State Tax Commission, and the objections filed in response by Pursue Energy Corporation and by the Unsecured Creditors' Committee. The Court, having considered the proof of claim, the amendments, the motion, the objections thereto, the testimony, evidence and exhibits presented at trial, as well as the parties' post-trial memorandum briefs, finds for the following reasons that the objections are well taken in part and should be granted in part and are not well taken in part and should be denied in part, and that the claim of the Mississippi State Tax Commission should be allowed as follows.

T. Glover Roberts, Richard G. Grant, Dallas, TX, C. Glen Bush, James T. Knight, Ridgeland, MS, Attorneys for the Debtor.

Derek A. Henderson, Jackson, MS, John M. Brown, Amarillo, TX, Attorneys for the Unsecured Creditors' Committee.

William F. Blair, Troy F. Odom, Jackson, MS, Attorneys for the Mississippi State Tax Commission.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON THE OBJECTIONS FILED BY THE DEBTOR AND THE UNSECURED CREDITORS' COMMITTEE TO THE PROOF OF CLAIM AND THE AMENDMENTS THERETO AND THE MOTION FOR PAYMENT OF ADMINISTRATIVE EXPENSES FILED BY THE MISSISSIPPI STATE TAX COMMISSION**

EDWARD ELLINGTON, Bankruptcy Judge.

This matter came before the Court for trial on the proof of claim, the amend-

## FINDINGS OF FACT

In the late 1970s, Pursue Energy Corporation (Debtor) and its three working interest partners, GPC Thomasville Corporation, Snyder 3300 Limited Partnership, and 3300 Corporation (collectively, partners), acquired interests in various oil and gas leases in the Thomasville field, Rankin County, Mississippi, to explore for gas. The raw gas produced from the Thomasville field is poisonous or "sour" gas which, in its natural state, has no market value at the mouth of the well. In order to render the "sour" gas marketable, it must be processed to remove the poisons.

The Debtor and its partners therefore constructed a plant (Pursue plant) to process the "sour" gas produced from its wells. They spent approximately $53,000,000 to build the Pursue plant, initially investing $9,500,000 and financing the balance of the construction costs with $42,500,000 of industrial revenue bonds issued by Rankin County and the cities of Brandon and Florence, Mississippi. The bond indenture governing the industrial

revenue bonds also contained a specific formula which the Debtor used to calculate the fee it charged the royalty owners and other working interest owners in its wells to process the "sour" gas. The formula allowed the Debtor to recover the operational costs of the Pursue plant, as well as a profit.

In 1980, the Debtor entered into a long-term contract to sell gas produced from the Thomasville field to Southern Natural Gas Company (SoNat). The long-term contract required the Debtor to sell to SoNat and Sonat to take "up to a maximum of [the Debtor's] pro rata portion of 180,000 Mcf[1] each day" of the gas produced. The Debtor's partners had separate gas contracts covering their respective interests in the Thomasville field.

Effective July 1, 1993, the Debtor and SoNat entered into an agreement to amend the long-term gas purchase contract they had executed in 1980 (buy down agreement). Each of the Debtor's partners in the Thomasville field also entered into separate buy down agreements with SoNat which were virtually identical in terms to the Debtor's buy down agreement, except for the parties and the amount of consideration paid.[2] The total consideration SoNat paid to the Debtor and its partners for the amendments to their respective gas purchase contracts was $79,000,000, of which the Debtor received $38,967,301.[3]

The buy down agreement stated that the $79,000,000 payment was made by SoNat to the Debtor and its partners as consideration for amending the preexisting gas purchase contracts. It further provided that the parties were deemed to have performed all of their respective duties and obligations under the preexisting contract, and released the parties from any outstanding claims under the preexisting contract. The buy down agreement also reduced the contract price per Mcf of gas delivered from $11.00 to $3.75 for a five year period beginning January 1, 1994, then to spot market price thereafter, and limited the amount of gas SoNat was obligated to take at the $3.75 price to eleven Bcf.[4] Neither the Debtor nor its partners were obligated to deliver gas as a condition of receiving the $79,000,000. In fact, only SoNat was obligated to perform under the buy down agreement.

In addition, the Debtor and its partners received the right to terminate the contract with SoNat at any time in the future upon thirty days written notice. Finally, the buy down agreement provided that the $79,000,000 payment was nonrecoupable and nonrefundable even if the Debtor and its partners elected to terminate the buy down agreement at any time in the future by giving the thirty days written notice.

The Debtor and its partners continued to sell gas under the buy down agreements at the amended contract price of $3.75 for twenty-nine months, from January 1, 1994, through June 1, 1996. The Debtor and its partners delivered approximately five Bcf of gas to SoNat at the amended price.

As a gas producer, the Debtor is required under Mississippi law to file with the Mississippi State Tax Commission (MSTC) monthly severance tax returns

---

1. An Mcf is a unit of gas measurement which equals 1,000 cubic feet.

2. Hereinafter, the four separate buy down agreements will be referred to collectively as the "buy down agreement," unless otherwise stated.

3. GPC Thomasville Corporation received $18,253,841, Snyder 3300 Limited Partnership received $15,245,200, and 3300 Corporation received $6,533,657.

4. A Bcf is a unit of gas measurement which equals one billion cubic feet.

and to pay severance taxes on the value of the gas produced or severed from the soil. Consequently, the Debtor reported all gas it sold to SoNat under the buy down agreement on its monthly severance tax returns and paid the appropriate amount of severance tax based on the $3.75 per Mcf sales price. The Debtor also reported its share of the payment received under the buy down agreement in the amount of $38,967,301 as miscellaneous income on its Mississippi income tax return and paid the appropriate amount of income tax attributable thereto. The Debtor did not report any portion of the $79,000,000 payment made to it and its partners in accordance with the buy down agreement on its severance tax return.

In 1995, the Debtor[5] purchased a separate "sour" gas processing plant owned by Shell Western E & P (Shell plant). The purchase transaction was effective as of June 1995 and closed in December 1995. Pursuant to the terms of the sale, Shell continued to operate the Shell plant for the Debtor's benefit from June 1995 through December 1995. The $2,468,146 profit Shell realized during that period was credited against the total purchase price of $14,943,000 at closing. After acquiring the Shell plant, the Debtor spent in excess of $5,500,000 to improve it. The testimony established that the Debtor's total capital investment in the Shell plant was $20,633,513.

Upon the purchase of the Shell plant, the Debtor abandoned the Pursue plant and began processing all of the "sour" gas through the newly acquired Shell plant. The Debtor also discontinued using the processing fee which had been set out in the bond indenture for the Pursue plant and adopted the processing fee Shell had been using to process gas through the Shell plant. The Shell plant processing fee was calculated using a formula which had been approved by the United States Court of Appeals for the Fifth Circuit in the case of *Piney Woods Country Life School v. Shell Oil Co.*, 726 F.2d 225 (5th Cir.1984). According to the Debtor, the formula used by Shell provided a processing fee which was cheaper than the processing fee the Debtor had been charging at the Pursue plant, thereby lowering the fee for all owners.[6]

On May 2, 1996, the law firm of McDaniel & Blair, P.A. sent a letter to the Debtor advising it that McDaniel & Blair had been employed by the State of Mississippi as a Special Assistant to the Attorney General to investigate, research and initiate proceedings against any entity which underpaid its severance tax or income tax liability. The May 2, 1996, letter requested that the Debtor provide the law firm with information regarding any gas purchase settlement payments the Debtor had received since 1980. McDaniel & Blair sent identi-

---

5. During this time frame, the Debtor also acquired the working interests of its three partners.

6. On June 1, 1996, the Debtor and SoNat terminated their business relationship by executing a second contract called a buy out agreement. Under that agreement, SoNat paid the Debtor $7,400,000 to buy out, i.e., terminate, the amended gas purchase contracts. SoNat also reimbursed the Debtor $1,000,000 for certain capital expenditures related to the Shell plant. The Debtor did not report the $7,400,000 buy out agreement pay-

ment on its severance tax return and paid no severance tax on that payment, and the MSTC does not object to the Debtor's treatment of the payment made in accordance with the buy out agreement. However, as discussed *infra*, the MSTC does maintain that the $1,000,000 capital costs reimbursement payment made by SoNat to the Debtor should be deducted from the Debtor's overall capital investment in the Shell plant for purposes of calculating the processing fee charged by the Debtor for processing the "sour" gas.

cal letters to approximately thirty gas producers which operated or formerly operated in Mississippi. Because the letter from McDaniel & Blair was not the standard form letter sent by the MSTC to inform a taxpayer that its tax returns were under examination, the Debtor did not immediately produce the requested information. Rather, the Debtor initiated litigation to determine whether the Attorney General had authority to hire a private law firm to assist it and the MSTC with tax investigations. *See Pursue Energy Corp. v. Mississippi State Tax Comm'n*, 816 So.2d 385 (Miss.2002). Following the resolution of that litigation in favor of the MSTC, the Debtor provided the requested documentation to the MSTC.

Based on the information received, MSTC auditor Lynn Wright prepared a gas severance tax audit report upon which the MSTC subsequently issued a severance tax assessment dated September 17, 2002, in the amount of $8,674,200 against the Debtor relating to the $79,000,000 payment made to the Debtor and its partners in accordance with the buy down agreement. The MSTC takes the position that the $79,000,000 payment made under the buy down agreement was not consideration for a contract amendment but was actually a disguised prepayment for gas to be produced in the future which should be subject to severance tax.

To that end, the MSTC explains that the original contract price of $11.00 per Mcf multiplied by the eleven Bcf of gas to be produced under the original contract equals $121,000,000. The MSTC further explains that the buy down contract price of $3.75 per Mcf multiplied by the eleven Bcf of gas to be produced under the original contract equals $41,250,000. The MSTC then demonstrates that $121,000,000 less $41,250,000 (the original contract price less the buy down amend-

ment price) equals $79,750,000, an amount almost identical to the buy down payment. Accordingly, the MSTC asserts that the $79,000,000 payment made under the buy down agreement was simply a prepayment for gas that the parties intended to be produced in the future, and that the $79,000,000 payment is therefore subject to severance tax.

The MSTC also issued a second severance tax assessment on September 17, 2002, in the amount of $2,397,014 relating to the gas processing fee charged by the Debtor. The gas processing fee assessment is based upon a severance tax audit conducted by MSTC auditor Lynn Wright at the Debtor's offices in Dallas, Texas. The MSTC contends that, as a part of its gas processing fee, the Debtor took deductions for capital investments, plant fuel and profit to which it was not entitled.

The Debtor filed its voluntary petition pursuant to chapter 11 of the Bankruptcy Code on September 20, 2002. Thereafter, the MSTC filed a proof of claim based on the two above referenced severance tax assessments. More specifically, the proof of claim is based on the $8,674,200 assessment which relates, as discussed, to the $79,000,000 payment made by SoNat to the Debtor and its partners pursuant to the buy down agreement, as well as the $2,397,014 assessment which, as mentioned, relates to the separate issue of whether the Debtor is entitled to take certain deductions related to its gas processing fee. The MSTC subsequently filed a number of amendments to the proof of claim, as well as a *Motion for Payment of Administrative Expenses,* seeking additional amounts which have accrued since the filing of the bankruptcy. The amendments and motion are based on the same alleged facts and theories of law upon which the original MSTC proof of claim is based.

Both the Debtor and the Unsecured Creditors' Committee (UCC)[7] filed objections to the MSTC's original proof of claim, as well as to the amendments, and to the motion.[8] The Debtor contends that the $79,000,000 payment was not a prepayment for gas but was merely the consideration SoNat paid for amending the long-term gas purchase contract. The Debtor further contends that the deductions taken on its gas severance tax returns were proper.

Thus, two primary issues are presented for the Court's determination. The first is whether the $79,000,000 paid to the Debtor in connection with the buy down agreement was consideration for that agreement or was actually a disguised prepayment for gas to be produced in the future which is subject to severance taxes. The second is what deductions from the sales price of the gas, for severance taxes purposes, the Debtor is entitled to take for processing the "sour" gas.

## CONCLUSIONS OF LAW

### I.

This Court has jurisdiction of the subject matter and the parties to this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

### II.

An unsecured creditor must file a proof of claim or interest for the claim to be allowed. Fed. R. Bankr.P. 3002(a). A properly filed proof of claim constitutes prima facie evidence of the validity and amount of the claim. Fed. R. Bankr.P. 3001(f). A party objecting to a properly filed proof of claim "must then produce evidence rebutting the claimant or else the claimant will prevail." *California State Bd. of Equalization v. Official Unsecured Creditors' Comm. (In the Matter of Fidelity Holding Co., Ltd.)*, 837 F.2d 696, 698 (5th Cir.1988). "If, however, evidence rebutting the claim is brought forth, then the claimant must produce additional evidence to 'prove the validity of the claim by a preponderance of the evidence.'" *In re Fidelity Holding Co.*, 837 F.2d at 698 (quoting *In re WHET, Inc.*, 33 B.R. 424, 437 (D.Mass.1983)). "The ultimate burden of proof always rests upon the claimant." *Id.* "This burden does not shift even where the claimant is a state or federal tax authority." *In re Fidelity Holding Co.*, 837 F.2d at 698 (citing *In re Watson*, 456 F.Supp. 432, 435 (S.D.Ga.1978)).

Moreover, in the case of *Simmons v. Savell (In re Simmons)*, 765 F.2d 547, 552 (5th Cir.1985), the United States Court of Appeals for the Fifth Circuit stated that "the filing of a proof of claim is tantamount to the filing of a complaint in a civil action ... and the trustee's formal objection to the claim, the answer." *In re Simmons*, 765 F.2d at 552; *see also In re Morton*, 2003 WL 23744636, at *2 n. 2 (Bankr. N.D.Tex. Nov.10, 2003) (proof of claim is viewed as analogous to a complaint and objection is responsive pleading); *Jenkins*

---

**7.** The Unsecured Creditors' Committee was appointed by the United States trustee pursuant to § 1102 of the Bankruptcy Code, located at Title 11 of the United States Code. Section 1102 provides that in cases filed under chapter 11 of the Bankruptcy Code, the United States trustee "shall appoint a committee of creditors holding unsecured claims...."

**8.** The positions taken by the Debtor and the UCC in their objections to the MSTC's proof of claim, the amendments thereto, and the motion are basically the same. Thus, for ease, the Court will hereinafter refer singularly to the Debtor, unless otherwise noted.

*v. Tomlinson (In re Basin Res. Corp.),* 182 B.R. 489, 493 (Bankr.N.D.Tex.1995) (proof of claim is seen as initial pleading and objection as responsive pleading).

Thus the MSTC bears the ultimate burden of proof, by the preponderance of the evidence, as to the validity and amount of its proof of claim and the amendments thereto.

## III.

■■■■ Prior to addressing the issues presented by the proof of claim, the amendments, the motion, and the objections thereto, the Court notes that "[t]he amount of tax a taxpayer owes to this state is determinable solely by reference to the positive provisions of the tax laws of this state and the regulations of the State Tax Commission promulgated within the scope of its authority." *Mississippi State Tax Comm'n v. Dyer Inv. Co., Inc.,* 507 So.2d 1287, 1290 (Miss.1987). Moreover, "[i]t is the well settled rule that '(t)ax laws are to be strictly construed against the taxing powers and all doubt resolved in favor of the taxpayer.'" *Lambert v. Mississippi Limestone Corp.,* 405 So.2d 131, 132 (Miss. 1981) (quoting *State Tax Comm'n v. Overstreet Inv. Co.,* 194 So.2d 236 (Miss.1967)).

In this particular case, Mississippi's severance tax statutes provide little assistance in determining what amounts, if any, the Debtor owes to the MSTC. That is, the MSTC's authority to levy a severance tax on gas and to provide how the tax accrues, is assessed, and is paid is governed by Mississippi Code Annotated § 27–25–701, § 27–25–703, and § 27–25–707. However, those statutes were adopted for the taxation of "sweet" gas, which comprises most of the gas produced in Mississippi and which has a certain value at the mouth of the well. The statutes do not take into consideration, and are not easily adaptable to taxing "sour" gas such as that produced from the Thomasville field, which as mentioned previously, has no market value at the mouth of the well. Moreover, other than one regulation relating to royalty owners, the MSTC has failed to adopt rules and regulations regarding severance tax matters even though it has been given the power and authority from the Mississippi legislature to do so. Consequently, the Court is afforded scant guidance for its decision.

## IV.

The Court further observes that the Debtor makes much of the MSTC's failure to properly conduct the audit underlying the $8,674,200 severance tax assessment on the buy down agreement and of the auditor's inexperience in regard to the audit underlying the $2,397,014 gas processing fee assessment. In that the Court is effectively conducting an independent review of the audits and reassessing the amounts due, the Debtor's concerns regarding how the audits were conducted need not be addressed.

## V.

As stated previously, the original proof of claim filed by the MSTC as well as the various amendments to it are based on severance tax assessments against the Debtor relating to gas produced from the Thomasville field. The first assessment in the amount of $8,674,200 relates to the $79,000,000 payment made by SoNat to the Debtor and its partners pursuant to the buy down agreement. The second assessment in the amount of $2,397,014 relates to the MSTC's disallowance of certain deductions with regard to the Debtor's gas processing fee.

### A. THE BUY DOWN AGREEMENT

#### 1. The Statute of Limitations

As an initial matter, the Court must consider the Debtor's contention that the

$8,674,200 assessment made in connection with the buy down agreement is barred as a matter of law by the statute of limitations applicable to severance tax returns. As mentioned, Mississippi's severance tax laws are set forth in Mississippi Code Annotated §§ 27–25–701 to—723 (Rev.2002).[9] Section 27–25–717 specifically provides that the administrative provisions of the Mississippi sales tax law apply to gas severance tax returns. Mississippi's sales tax law is set forth in §§ 27–65–1 to—231 (Rev.2005). Section 27–65–42 provides the statute of limitations period applicable to severance tax, as follows:

> § 27–65–42. Statute of limitations.
>
> The amount of taxes due on any return which has been filed as required by this chapter shall be determined and assessed within thirty-six (36) months from the date such return was filed, and no suit or other proceedings for the collection of any taxes due shall be begun after the expiration of thirty-six (36) months from the date such return was filed. However, when an examination of a taxpayer's records to verify returns made under this chapter has been initiated and the taxpayer notified thereof, either by certified mail or personal delivery by an agent of the Commissioner, within the thirty-six-month examination period provided herein, the determination of the correct tax liability may be made by the commission after the expiration of said thirty-six-month examination period, provided that said determination shall be made with reasonable promptness and diligence.

Miss.Code Ann. § 27–65–42. Thus, § 27–65–42 provides for a three year statute of limitations, running from the time the relevant severance tax return was filed, unless an examination has been initiated and the taxpayer properly notified thereof.

The Debtor and its partners received the $79,000,000 payment under the buy down agreement in July 1993. The Debtor acknowledges that it did not pay severance tax on the payment. Severance tax returns are due on the 25th day of the month following the month of actual production. Consequently, the Debtor maintains that if any severance tax was due on the $79,000,000 payment, it should have been reported on the July 1993 severance tax return. The Debtor's July 1993 severance tax return was filed on August 25, 1993. The parties thus take the position that the three year statute of limitations period with regard to the payment made under the buy down agreement would have expired on August 25, 1996.

As noted, just prior to the expiration of the statute of limitations period, on May 2, 1996, the private law firm of McDaniel & Blair, P.A. sent a certified letter to the Debtor advising it that McDaniel & Blair had been employed by the State of Mississippi to investigate, research and initiate proceedings against any entity which underpaid its Mississippi severance tax or income tax liability. The May 2, 1996, letter also requested that the Debtor provide McDaniel & Blair with information regarding any gas purchase settlement payments the Debtor had received since 1980. McDaniel & Blair sent identical letters to approximately thirty gas producers which operated or formerly operated in Mississippi. Specifically, the letter stated:

> Gentlemen:
>
> Please be advised that our firm has been employed by the State of Mississippi, acting by and through the Attor-

---

9. Hereinafter, all code sections refer to Mississippi Code Annotated unless otherwise noted.

ney General and the Mississippi State Tax Commission, as Special Assistants to the Attorney General to investigate, research, and initiate proceedings against any entities which failed to pay applicable severance and/or income taxes on revenues they received from gas fields located in Mississippi. In this regard, the State believes that some gas producers failed to pay severance and/or income taxes due the State on gas contract settlements which included, among other things, take-or-pay, gas buydown or buyout, price deficiency and ratable take payments from gas purchasers for gas fields in the State of Mississippi. The State of Mississippi believes that such payments triggered severance and income tax obligations which were not properly paid and which may remain due.

Within thirty (30) days of this letter, we hereby request that you provide the State of Mississippi, acting by and through our firm, with the following information regarding each gas field in the State of Mississippi in which you received any settlement payments from gas purchasers since 1980:

1. Name of each Field and County in which it is located and each Well involved therein;

2. The total of each settlement for each Well and Field and the date of payment(s) for each settlement;

3. The amount of funds paid and the allocation of funds to each settlement category;

4. Whether any portion of the payment(s) was included on any income and/or severance tax returns filed with the State and whether any tax was paid to the State on each such Settlement; and

5. If you answered YES to Question No. 5[sic], please describe the total amount of any taxes paid and the applicable tax period, the exact manner in which such payment was calculated, and the return(s) which included all such income and/or tax.

If your company received any gas contract settlement payment(s), either as an operator or as the actual working interest owner, please respond with the requested information within the thirty (30) day time period. If we do not receive a timely response from your company, we must conclude that it received taxable payments for which taxes were not paid. In that event, we may be forced to subpoena your records to determine the taxes due on the full settlement amounts, plus interest and penalties. Please be advised that penalties on such late payments can be significant.

Please accept this letter as a formal demand from the State of Mississippi and the Mississippi State Tax Commission, acting by or through the undersigned firm, for full payment of all taxes described above which are owed by your company, either as operator and/or as a working interest owner, plus interest and penalties.

Sincerely yours,

McDaniel & Blair

(Debtor Ex. 11 at 1–2).

The May 2, 1996, letter was an unusual form of communication given that at the time the letter was sent to the Debtor, the MSTC generally utilized a standard form of "statute" letter designed, among other things, to toll the statute of limitations on specific gas severance tax returns under examination. For example, in contrast to the letter sent by McDaniel & Blair, the standard "statute" letter was composed as follows:

Dear Taxpayer,

You are hereby notified that an examination has been initiated on the indicated Mississippi tax return(s). The period under review begins [specific date] and concludes with the most recently filed tax return. Please make all records relating to these returns available for my review.

In accordance with the Mississippi Annotated Code of 1972 sections that are identified below, this letter serves to arrest the Statute of Limitations on the tax returns under review. Thus, any tax return filed on or after [specific date] will be subject to examination and the Statute of Limitations is hereby arrested.

. . . .

A tentative date, time and place for this examination is shown below.

. . . .

Enclosed you should find a list of the records required for a review of your tax return(s).

. . . .

Sincerely, Auditor

Enclosure:

Tax Types to be audited and MS Code Statute of Limitations References: § 27–25–717 Natural Gas Severance Tax

(Debtor Ex. 30 at 1).

The MSTC did not send a standard form "statute" letter to the Debtor relating to severance returns covering the period of time during which the $79,000,000 payment was received under the buy down agreement. The Debtor contends that, in fact, the May 2, 1996, letter was never intended as a "statute" letter but was instead mailed to various gas producers in accordance with the retention agreement between the law firm and the Attorney General. Paragraph 4A of the retention agreement provides:

A. Attorneys' fees of fifteen percent (15%) of the net recovery received by the State from any and all claims initiated via inquiry and/or demand letter by the Firm and/or prosecuted by or through the Mississippi State Tax Commission ("Commission"), regardless of whether such claims are settled at any time after inquiry or prosecuted to final decision by the Commission; or (2) twenty-five percent (25%) of the net recovery received by the State from any such claims which are resolved through litigation in any court or following an appeal of a judicial decision or Commission decision to the Mississippi Court of Appeals and/or the Mississippi Supreme Court.

(UCC Ex. 6 at 3).

According to the Debtor, the retention agreement demonstrates that McDaniel & Blair sent the May 2, 1996, letter not to arrest the statute of limitations but to trigger its right to a fee under paragraph 4A. The Debtor thus reasons that because the MSTC has never issued a standard "statute" letter on the $8,674,200 assessment and is now faced with a statute of limitations problem regarding collection of the $8,674,200 assessment, it has been forced to rely on the May 2, 1996, letter, which it asserts is the only document addressed to the Debtor which predates the August 25, 1996, deadline.

The MSTC maintains that it is not required to use a form "statute" letter and that any letter which meets the statutory requirements is sufficient because the purpose of the statute is simply to give the taxpayer notice that an examination is underway. The MSTC contends that § 27–65–42 includes only three requirements: 1) notice, 2) by certified mail or personal service, 3) by an agent of the Commissioner. The MSTC asserts that each of the three elements was satisfied because

McDaniel & Blair, acting as an agent of the MSTC, sent a certified mail notice of the commencement of an examination of the Debtor's records regarding unpaid severance taxes and requested specific documentation regarding certain gas contract settlements. Accordingly, the MSTC contends that May 2, 1996, letter from McDaniel & Blair served to toll the statute of limitations despite the fact that it was not a standard form "statute" letter.

To the MSTC's argument, the Debtor first responds that the statute specifically requires as a predicate to tolling limitations that an examination of the taxpayer's records to verify specifically filed returns be initiated and that the taxpayer be notified of the examination. The Debtor asserts that in this case, no examination had been initiated by the MSTC on specifically filed severance tax returns. Indeed, the testimony at trial established that neither the MSTC nor the Attorney General had reviewed any of the Debtor's gas severance tax returns or looked at any of the Debtor's tax information relevant to severance taxes before the May 2, 1996, letter was sent. Thus the Debtor maintains that the MSTC had not begun a deliberate investigation into its severance tax returns as required by Mississippi law.

Secondly, the Debtor contends that McDaniel & Blair was not an agent of the MSTC for purposes of sending a statute letter. That is, although McDaniel & Blair was hired as a Special Assistant Attorney General, Kathy Waterbury, MSTC Assistant Commissioner and the MSTC's corporate representative at trial, testified that McDaniel & Blair was not hired to perform routine audit functions. Moreover, Lynn Wright, the auditor on the assessments at issue in this case, testified that sending out a statute letter is a routine part of an auditor's work. And finally, the Debtor's expert, Lester Herrington, a former MSTC Deputy Commissioner, testified that in his opinion, the May 2, 1996, letter did not contain the MSTC's standard notice requirements and was not a normal audit letter.

 Although it certainly appears that McDaniel & Blair sent the May 2, 1996, letter to trigger the fee arrangement, in the Court's opinion the letter also appears to meet the requirements set forth in § 27–65–42. That is, even though an investigation into specific tax returns had not yet been initiated as of May 2, 1996, as Kathy Waterbury testified, "[W]hen these letters were sent, not only to Pursue but to all of the other businesses that we sent them to, we were not aware of whether or not they had a gas contract settlement. That's what the investigation was about, to ascertain who had them." (Trial Tr. vol. 1, 214, Aug. 18, 2004). Thus, the Court is persuaded that an investigation to verify filed severance tax returns was initiated by the May 2, 1996, letter, prior to the expiration of the limitations period of August 25, 1996.

In addition, although McDaniel & Blair was not hired to perform routine audit functions, per se, it was hired specifically to conduct investigations into severance taxes on behalf of, and consequently as an agent of the MSTC. The May 2, 1996, letter stated that the law firm was "employed by the State of Mississippi, acting by and through the Attorney General and the Mississippi State Tax Commission, as Special Assistant[ ] to the Attorney General to investigate, research, and initiate proceedings" regarding the nonpayment or underpayment of severance taxes. The Court therefore finds that the Debtor was notified of the investigation by an agent of the MSTC. Accordingly, the Court concludes that, albeit unorthodox, the May 2, 1996, letter sent by McDaniel & Blair to the Debtor satisfies the requirements set

forth in § 27–65–42, thereby tolling the statute of limitations period.[10]

### 2. Was the $79,000,000 a Prepayment for Gas?

#### a. The Parties' Positions

As previously noted, on September 17, 2002, the MSTC issued a severance tax assessment in the amount of $8,674,200 against the Debtor relating to the $79,000,000 lump sum payment made to the Debtor and its partners in accordance with their buy down agreements. The MSTC maintains that the $79,000,000 represents the difference between the $11.00 per Mcf of gas to be produced under the original long-term gas purchase contract and the $3.75 per Mcf of gas at the buy down price under the amended gas purchase contract.[11] The MSTC argues that the $79,000,000 lump sum payment thereby constitutes a prepayment for gas to be produced in the future which, although made in advance, is nevertheless a component of the overall value of the gas that should be included in the "total receipts"

of the sales price received for the gas and that should be subject to severance tax. *See 3300 Corp. v. Marx*, 633 So.2d 1028, 1030 (Miss.1994) (MSTC has a "long standing policy of charging severance taxes on the total receipts by a natural gas producer.").[12] In other words, the MSTC contends that the $3.75 per Mcf of gas does not reflect the true value of the gas produced but rather, the $79,000,000 prepayment also constitutes a portion of the value of the gas and should be subject to severance tax. The MSTC also takes the position that the first time gas was severed under the buy down contract, the entire $79,000,000 payment became taxable rather than any pro rata portion of that payment based on the amount of gas actually produced.

On the other hand, the Debtor maintains that under the plain language of § 27–25–703(2), severance tax accrues when gas is produced or severed from the soil. The Debtor contends that because no gas was produced or severed in connection with the $79,000,000 payment, it is not subject to

10. The Court observes that in accordance with its determination, discussed *infra*, that the portion of the $79,000,000 attributable to gas which was actually produced each month did indeed act as a prepayment for that amount of gas, the three year statute of limitations period may have begun from the time the severance tax return was due on each month's actual production. However, because at trial the Debtor took the position that none of the $79,000,000 was subject to tax and that the statute of limitations period had expired, and because the MSTC took the position that the entire $79,000,000 payment was taxable from the moment one Mcf of gas was produced under the buy down amendment, the parties addressed the statute of limitations issue only in regard to the August 25, 1993, severance tax return date. Neither party raised any statute of limitations concerns with regard to each period of actual monthly production. Accordingly, the Court makes no findings on that issue.

11.
Original contract price:
$11.00 per Mcf × 11 Bcf of gas = $121,000,000
Buy down contract price:
$ 3.75 per Mcf × 11 Bcf of gas = $ 41,250,000
Difference in contract prices: $ 79,750,000

12. As discussed in more detail *infra*, the MSTC acknowledges that it does not assess severance tax on take-or-pay settlements, which are made in lieu of gas production, or buy out contracts, which are made to terminate the parties' relationship, thereby ending gas production. That is, because no gas is severed in either case, no severance tax is assessed. However, the MSTC asserts that it does assess severance tax on buy down contract payments because the producer takes a lump sum advance payment in exchange for a buy down of the price it charges for gas. As noted, according to the MSTC, the lump sum payment, although made in advance, is nevertheless a component of the value of the gas and is thus subject to severance tax.

severance tax under the statute. In addition, the Debtor asserts that under the plain, unambiguous language of the buy down amendment itself, the $79,000,000 was a nonrefundable, nonrecoupable payment made as consideration for the contract amendment. The Debtor argues that such a nonrefundable, nonrecoupable payment, coupled with the lack of any obligation on behalf of the Debtor to deliver gas, negates the MSTC's argument that the $79,000,000 acts as a prepayment for gas to be delivered in the future.

#### b. Mississippi's Gas Severance Tax Statutes and Relevant Case Law

The relevant severance tax statutes are as follows:

§ 27–25–701. Definitions.

(d) "Value" means the sale price, or market value, at the mouth of the well. If the gas is exchanged for something other than cash, or if there is no sale at the time of severance, or if the relation between the buyer and the seller is such that the consideration paid, if any, is not indicative of the true value or market price, then the commissioner shall determine the value of the gas subject to tax, considering the sale price for cash of gas of like quality in the same or nearest gas-producing field.

§ 27–25–703. Privilege tax levied; exemptions.

(1) Except as otherwise provided herein, there is hereby levied, to be collected hereafter, as provided herein, annual privilege taxes upon every person engaging or continuing within this state in the business of producing, or severing gas, as defined here, from below the soil or water for sale, transport, storage, profit or for commercial use. The amount of such tax shall be measured by the value of the gas pro-

duced and shall be levied and assessed at a rate of six percent (6%) of the value thereof at the point of production, except as otherwise provided in subsection (4) of this section.

The tax is hereby levied upon the entire production in this state, regardless of the place of sale or to whom sold or by whom used,.... The tax shall accrue at the time the gas is produced or severed from the soil or water, and in its natural, unrefined or unmanufactured state.

Miss.Code Ann. § 27–25–701(d), § 27–25–703(1), (2).

The statutes do not specifically address whether a payment made in accordance with a buy down amendment is subject to severance tax. The Court recognizes, however, that "[i]t is the well settled rule that '(t)ax laws are to be strictly construed against the taxing powers and all doubt resolved in favor of the taxpayer.'" *Lambert v. Mississippi Limestone Corp.*, 405 So.2d 131, 132 (Miss.1981) (quoting *State Tax Comm'n v. Overstreet Inv. Co.*, 194 So.2d 236 (Miss.1967)). The Court observes as well that the MSTC has no published rules or regulations regarding the imposition of severance taxes. Finally, the Court notes that none of the parties have provided, nor has the Court been able to locate, any Mississippi case or any United States Court of Appeals for the Fifth Circuit case which directly addresses the precise issue before the Court.

Nevertheless, the Debtor maintains that under the plain language of § 27–25–703(2), severance tax could only accrue on the $79,000,000 payment when gas was actually produced or severed and that because no gas was severed in connection with the payment, no severance tax can be due. To that end, the Debtor presented at trial the expert testimony of Emmitte Haddox, a Certified Public Accountant

(CPA) with extensive experience in the field of oil and gas accounting. After reviewing the severance tax statute, Haddox testified, "The statute is very clear you report gas sales when the gas is severed or produced, and the severance tax liability accrues when gas is severed or produced." (Trial Tr. vol. 5, 174, Oct. 28, 2004). He further testified, "There's really no option as to when or what period you're going to pick up that gas on your severance tax return and when you're going to pay the tax." (Trial Tr. vol. 5, 175, Oct. 28, 2004).

The Debtor further maintains that under the plain, unambiguous language of the buy down amendment itself, the $79,000,000 payment was made simply as consideration for the contract amendment. Again, the Debtor relies upon the testimony of Emmitte Haddox. Haddox visited the Debtor's office on two occasions to review its books and records. He reviewed numerous contracts and related documents. He reviewed the Thomasville plant allocation worksheets. He reviewed severance tax records, federal income tax returns, and corporate audit reports. Haddox testified that there was nothing in the documents to support the argument that the $79,000,000 was a prepayment for gas. Haddox testified that he had analyzed the buy down agreement and that the payment was made in consideration of modification of the contract.

Haddox further testified that in order for the payment to be treated as a prepayment for gas, there must have been an obligation to deliver gas to SoNat for the payment, and that there must have been a mechanism for crediting delivered gas against that payment. Haddox testified that the $79,000,000 payment could not be a prepayment for gas because it was non-recoupable, there was no obligation to deliver gas, and there was no provision for credits against the payment for future pro-

duction. To that end, Haddox testified, "The contract was very clear that the money was nonrefundable, nonrecoupable or recoverable." (Trial Tr. vol. 5, 170, Oct. 28, 2004). Moreover, he testified,

> The ... modification has a 30–day cancellation provision. The contract was entered into, I believe July 1, 1993, and the buydown provision was not effective until January 1, 1994. So you had a six-month period of time between the date it was signed and the effective date of the buydown.

> Pursue certainly had the right, with this 30–day cancellation provision, certainly had the right to cancel the contract before it ever became effective on January 1, 1994. So they clearly could never have delivered an MCF of gas under this contract provision of the buydown.

(Trial Tr. vol. 5, 170–171, Oct. 28, 2004). He further testified that even if the Debtor had never delivered any gas under the buy down amendment, the Debtor would not have had to refund the $79,000,000 payment.

Haddox also testified that there are no accounting principles to support the MSTC's prepayment argument. Haddox explained that an auditor or accountant would be required under Generally Accepted Accounting Principles (GAAP) or auditing standards to look at the contract to determine if there was an obligation to deliver in the future. The contract would also provide a mechanism for accounting for the prepayment against deliveries. The buy down agreement does not provide for either. In addition, the auditor or accountant would look at the books and records of the company to see how it treated the payment. A prepayment would be booked as a liability on the balance sheet. As gas was delivered, the liability would be reduced and added to sales revenues. Yet, the Debtor's books and records did not

reflect such a liability or deliveries of gas credited against such a liability. Haddox stated that accordingly, in his opinion, the $79,000,000 payment should not be subject to severance tax because there was nothing in the documents to support the argument that the $79,000,000 was a prepayment for gas.

Haddox further noted that his review of the Debtor's records revealed that KPMG Peat Marwick (KPMG), in an independent audit of the Debtor's records, had given a "clean opinion" that the Debtor's financial statements were in accordance with GAAP in reporting the Debtor's portion of the $79,000,000 payment as income. (Trial Tr. vol. 5, 172, Oct. 28, 2004). Haddox testified that KPMG agreed with the Debtor's position that the payment was income that year. He stated that if KPMG had determined that the buy down agreement was a prepayment as opposed to income, KPMG "would have been required to express an adverse opinion that the financial statements were not in accordance with generally accepted accounting principles." (Trial Tr. vol. 5, 173, Oct. 28, 2004).

Moreover, in support of its position that the $79,000,000 payment is not subject to severance tax, the Debtor urges the Court to consider the decision in the *Harkins* matter, a 1988 decision rendered by the MSTC itself. In that matter, an auditor had determined that a gas contract settlement payment made by Transcontinental Gas Pipeline Corporation (Transco) to Harkins & Company (Harkins) was subject to severance tax. Harkins appealed the auditor's ruling. On appeal, the Board of Review affirmed the auditor's decision and stated:

> Transcontinental paid Harkins and certain others of the producers substantial sums to reform the contract.... [T]he "take or pay" provisions of the contracts were deleted, and the purchase price of

the gas was reduced to market value....

....

> The Board [of Review] was of the opinion that the settlement payment is a part of the value of the gas produced under the contracts, and that the auditor was correct....

(Debtor Ex. 21 at 1–2).

However, the parties appealed the decision to the Commission, which reversed and abated the assessment. The Debtor thus maintains that the MSTC itself has ruled that the proceeds from settlement of a gas contract to reduce an above market gas price are not properly subject to severance tax. Moreover, notes the Debtor, the Attorney General subsequently rendered an opinion in relation to the *Harkins* case wherein the Attorney General described that settlement as a "lump sum payment to induce Harkins & Company to drastically amend the gas purchase contract it had with Transco [which] does not appear to represent ... [the] purchase price of ... gas severed from the ground." (Debtor Ex. 22 at 1–2).

The MSTC attempts to distinguish the *Harkins* matter in two ways. First, the MSTC attempts to distinguish the settlement in *Harkins* as a take-or-pay settlement on which the MSTC does not assess severance tax. However, while the *Harkins* case dealt with the deletion of take-or-pay provisions from an earlier contract, it is apparent that the settlement involved more than the deletion of those take-or-pay provisions. Therefore, the Court is unpersuaded that the simple description of the *Harkins* case as a "take-or-pay" case excludes it from consideration regarding the buy down agreement at issue.

Secondly, the MSTC maintains that the *Harkins* case dealt with a buy out settlement as opposed to a buy down settlement.

The MSTC acknowledges that it does not assess severance tax on a buy out settlement. Yet, the Court observes that the designation (and consequently, the precedential effect) of the *Harkins* settlement as a buy out or buy down agreement is somewhat problematic. Indeed, the petition filed by Harkins & Company with the MSTC states specifically that the payment was for a "buy-out of its contract." (MSTC Ex. 52 at 3). Moreover, Fred Hosey, the Debtor's General Counsel, testified that the *Harkins* settlement "was a buy out of the existing contract." (Trial Tr. vol. 4, 79, Oct. 27, 2004). Confusingly, however, the MSTC Board of Review minutes in *Harkins* state that substantial sums were paid "to reform the contract" and that "the 'take-or-pay' provisions of the contracts were deleted, and the purchase price of the gas was reduced," (Debtor Ex. 21 at 1), thus suggesting that the gas contracts were amended, at least in part, to buy down the price of the gas. Furthermore, the Attorney General's opinion describes the settlement as a payment to "drastically amend" the gas purchase contract, (Debtor Ex. 22 at 1), and Hosey testified that the *Harkins* amendment reduced the price of gas on a going-forward basis. Both of those statements also seem to suggest that the *Harkins* settlement payment included a buy down of the price of the gas.

In that the evidence does not clearly demonstrate whether the *Harkins* settlement was a buy out or buy down, the Court finds that, contrary to the Debtor's urging, the *Harkins* decision is not determinative of the issue of whether a buy down agreement is subject to severance tax.

The Debtor maintains that nevertheless, the United States Court of Appeals for the Fifth Circuit has settled the issue in *Williamson v. Elf Aquitaine, Inc.,* 138 F.3d 546 (5th Cir.1998). In that case, the Fifth Circuit, applying Mississippi law, held that royalty owners were not entitled to royalties from the proceeds of a nonrecoupable payment by the purchaser to the producer in settlement of a gas contract. The Fifth Circuit found that the nonrecoupable payment did not represent funds for severed gas and that royalties were not payable because the nonrecoupable nature of the payment precluded it from being tied to future production. The court further found that production occurs when the gas is brought to the surface and is severed, *id.* at 550–51, and that because there was no production of gas associated with the payment, no royalties were due. Under the same reasoning, the Debtor contends that a nonrecoupable buy down payment is not subject to the severance tax because it cannot be tied to future production.

As with the *Harkins* case, the MSTC attempts to distinguish the *Elf Aquitaine* case as a take-or-pay case. However, the Fifth Circuit noted that the settlement in that case was for both a release of take-or-pay obligations and a reduced future price (a buy down), and consequently, the Court will not exclude it from consideration.

To that end, the *Elf Aquitaine* case, although addressing the nonrecoupable nature of a settlement payment in the context of royalty payments, specifically noted that following the settlement payment, the purchaser did not continue to buy gas from the producer. Thus, even though the Fifth Circuit determined that the producer was not required to pay royalty on the nonrecoupable settlement payment because it was never linked to any severed gas, it did not address whether severance tax would be due on that same nonrecoupable settlement payment when the payment was linked to gas actually produced and severed at a later time. In fact, the producer in that case argued that royalty would

have been required only when gas was produced or sold. In the case at bar, gas was actually produced and sold following the buy down agreement. Thus, once again contrary to the Debtor's urging, the Court does not find the *Elf Aquitaine* case to be determinative of whether severance tax is due on gas actually produced and sold under a buy down agreement.

### c. Gas Severance Tax Statutes and Case Law from Other Jurisdictions

In that neither the severance tax statute nor Mississippi or Fifth Circuit case law resolves the precise issue of whether gas purchase contract buy down amendments are subject to severance tax, the MSTC relies on statutes from other jurisdictions as well as cases interpreting statutes from other jurisdictions in support of its position that the $79,000,000 buy down payment is a disguised prepayment for gas to be produced in the future and that as part of the total value of the gas produced, the payment is subject to severance tax in Mississippi. For instance, the MSTC argues that the laws of Texas and New Mexico hold that gas contract buy down payments generate severance taxes. Yet, the law governing assessment of severance tax on buy down agreements in those states is specifically set forth by statute. For example, 34 Texas Administrative Code § 3.20(b)(2) and (c)(4) (2004) provide, in pertinent part:

> (b) The producer's gross cash receipts subject to severance tax shall include:
>
> (2) all monies that are received as compensation by the producer in connection with any judgment, compromise, or settlement agreement relating to the recovery of the contract price of gas produced. . . .

> (c) The producer's gross cash receipts subject to severance tax shall not include:
>
> (4) a payment made to a producer by a gas purchaser to amend any provision in the gas purchase contract, except for a provision affecting the price to be paid by the purchaser.

34 Tex. Admin. Code § 3.20(b)(2), (c)(4) (2004).

Additionally, § 3.20(f)(2) states:

> If a producer receives a non-recoupable payment as consideration for amending any provision in the contract affecting the price of gas, then the tax shall be due based upon the value the producer would have received under the pricing provisions of the contract before they were amended. . . .

34 Tex. Admin. Code § 3.20(f)(2) (2004). Thus, directly contrary to Mississippi law, Texas' natural gas tax administration law statutorily provides that a gas buy down contract is subject to severance tax.

Similarly, New Mexico's oil and gas severance taxation law provides:

> "Actual price" means the money or other consideration received or accrued for the product. . . . Actual price includes all receipts, whether the receipt is characterized as a payment for the product, a reimbursement for tax or other expense. . . . Receipts from take-or-pay contracts or negotiated contract settlements become part of the actual price to the extent that such receipts are consideration received for product severed and sold.

N.M. Stat. Ann. § 3.18.1.7 (2004). Because the laws of Texas and New Mexico subject buy down amendments and negotiated contract settlements to severance tax pursuant to statute, the Court does not find those authorities particularly persuasive.

However, the MSTC cites cases from other jurisdictions in support of its contention that the $79,000,000 payment is subject to severance tax. Although decided in the context of royalty payments, the Court nevertheless finds these cases instructive. In *In re Century Offshore Mgmt. Corp.*, 111 F.3d 443 (6th Cir.1997), the United States Court of Appeals for the Sixth Circuit considered whether a gas contract settlement constituted a payment for production triggering an obligation to pay royalties under a royalty lease contract. In that case, Century produced natural gas from federally-owned submerged lands in the Gulf of Mexico. Century sold the gas to Enron Gas Marketing, Inc. under long term fixed price contracts which included nonrecoupable take-or-pay provisions. Enron made a lump sum payment of $12,250,000 to Century to cancel the existing contracts, including the take-or-pay provisions, and to simultaneously replace them with floating market price contracts. Soon thereafter, Hurricane Andrew caused extensive damage to Century's platforms in the Gulf, eventually causing Century to file bankruptcy pursuant to chapter 11 of the Bankruptcy Code. The Minerals Management Service of the United States Department of the Interior (DOI) filed a proof of claim in Century's bankruptcy proceeding alleging that it was the holder of an unsecured priority claim for royalties on the lump sum payment. The bankruptcy and district courts denied the DOI's royalty claim, concluding that the lump sum payment was not a payment for the production of gas, but was merely a settlement payment designed to terminate the original contracts.

In reversing the bankruptcy court and the district court, the Sixth Circuit phrased the issue as one of statutory interpretation of the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1356 (1996), which provided for "a royalty of a fixed percentage of 'the amount or value of the production saved, removed, or sold' by the lessee." *Id.* at 446. The *Century* court also noted that the DOI had "adopted the 'gross proceeds' rule, a broad view of 'the amount or value of production'" meaning "the total monies and other consideration accruing to an oil and gas lessee for the disposition for the oil [or gas] produced." *Id.* at 446.

The court refused to characterize the transaction as either a buy down of the original contracts' prices or a buy out of the take-or-pay clauses. Rather, the court found that although the parties entered into two separate contracts, the termination contracts and the replacement contracts, there was only one transaction for purposes of the dispute. The Sixth Circuit then focused on the existence of a nexus between the settlement payment and the subsequent production and concluded that the transaction, viewed as a whole, was clearly linked to gas "production saved, removed or sold." *Id.* at 445. It further stated "[a]n up-front payment made in exchange for a substituted contract that changes the price of the old contract, followed by new purchases, is a sufficient case of new production of gas to qualify as 'production sold' under the Act." *Id.* at 445. In sum, the court stated:

> [W]e hold that the lump sum payment contemplated and was the cause of new gas sales to be delivered in the future, where the parties intended a continuing relationship, and where much of the gas identified in the original contracts was delivered under the replacement contracts. The lump sum behaved as an advance payment under the substituted requirements contract. As a result, the payment was for "production sold" under the statute, and the royalty was payable when the gas was produced.

*Century Offshore*, 111 F.3d at 449.

Additionally, the United States Court of Appeals for the Tenth Circuit in *Har-*

vey E. Yates Co. v. Powell, 98 F.3d 1222 (10th Cir.1996), was faced with the issue of whether settlement proceeds were paid for produced gas as opposed to buying out contractual obligations. In that case, Yates entered into long-term gas contracts, which included take-or-pay provisions, with Transwestern Pipeline Company. Yates accepted a $275,000 nonrecoupable buy down payment from Transwestern in exchange for certain price and take reduction amendments to the supply contracts. *Id.* at 1227. Yates did not pay royalties to the lessor on the buy down payment. The relevant state statute provided that royalties were due on gas which was "produced and saved from the leased premises," and that the lessor was not entitled to a royalty unless the contested proceeds received by Yates were "ultimately recouped by [Yates] in exchange for actual 'production' of gas from the leased tracts—i.e., 'physical extraction of the gas from the ground and its removal'." *Id.* at 1234–35. The Sixth Circuit held:

> [T]he lessee's duty to pay royalty on that portion of a settlement which is attributable to future price reductions is not triggered until that future production is actually taken by the settling purchaser. Thus, when a lessee negotiates a buy down payment in exchange for a reduced future price term, the state has no right to a royalty up front on that portion of the settlement proceeds. However, ... when the future production under the purchase contract is taken at the newly 'bought-down' price, the state should receive a royalty

based on both: (1) the proceeds obtained by the lessee from the sale of gas at the bought-down price; and (2) a commensurate portion of the settlement proceeds that is attributable to price reductions applicable to future production under the renegotiated gas sales agreement as production occurs. We believe this approach is faithful to the express terms of the ... statutory lease which condition royalty payments on actual production. This approach also eliminates a lessee's incentive to circumvent the royalty clause by maximizing lump sum settlements while minimizing the future price of gas.

*Id.* at 1236.[13]

Additionally, in *Shoshone Indian Tribe v. U.S.*, 58 Fed.Cl. 77 (Fed.Cl.2003), the issue before the court was whether a motion for summary judgment should be granted for the government's failure to collect royalties on a certain portion of a settlement amount allocated to take-or-pay payments. The court began by determining that it "must examine the underlying economic reality" of the settlement payment at issue. *Id.* at 86. The Court further stated that the "touchstone for deciding whether a settlement payment is royalty-bearing is whether there is a 'link' or a 'nexus' between the payment and the production of gas." *Id.* at 86–87 (quoting *Independent Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d, 1248, 1259 (D.C.Cir.1996) and *In re Century Offshore Mgmt. Corp.*, 111 F.3d 443, 449–50 (6th Cir.1997)). It noted that, the necessary link between a lump sum payment and production can exist in either the buy down or the ad-

---

**13.** One year later in *Watts v. Atlantic Richfield Co.*, 115 F.3d 785 (10th Cir.1997), the United States Court of Appeals for the Tenth Circuit expanded its settlement payment analysis stating, "[A] lessor's royalty interest is not limited to settlements involving an actual 'buy-down,' as in *Yates*, but extends to any

settlement in which a producer receives consideration for compromising its pricing claim, assuming of course, that the pricing claim relates to either past or future production actually taken by the settling purchaser." *Watts*, 115 F.3d at 793.

vance payment situation. In a buy down, "a settlement payment . . . to the producer . . . accompanies renegotiation of other terms in the supply contract, such as 'a reduced price term, an extension of the delivery terms, a reduction in the minimum or total quantity to be purchased, or some combination of these elements.'" *Id.* at 87 (citations omitted).

The court further noted "the portion of a settlement attributable to a buy-down arrangement is royalty bearing when the future production occurs." *Id.* at 87. The court ultimately denied summary judgment on whether royalties were due on the portion of the settlement amount allocated to the take-or-pay payments because there were facts sufficient to support a conclusion that there was a link between the settlement and the production of gas at a later time.

The United States District Court for the District of Columbia stated in the case of *Chevron USA Production Co. v. U.S. Dept. of Interior,* 254 F.Supp.2d 107 (D.D.C. 2003):

> Chevron entered into numerous settlement agreements with purchasers to amend or replace take-or-pay contracts. A portion of each settlement payment at issue was attributable to the buydown of the contract price for gas. Rather than continuing to pay the higher set price contained in the original take-or-pay contracts, upon execution of the replacement or amended contracts, the purchasers were able to take the gas at a price tied to the market value of gas when taken. After these settlements amended or superceded the previous contracts, the purchasers continued to take gas from the lessees.
>
> . . . .
>
> Chevron was ordered to pay royalty on the total of the reduced price purchaser paid for the gas and the price purchaser

paid to receive that reduced price on that gas.

> . . . .
>
> Because the settlement contracts at issue were drafted to denominate the payments as 'nonrecoupable,' Chevron reasons, the inquiry ends there. In actuality, . . . "[t]he relevant question . . . is whether or not the funds making up the payment actually pays for any gas severed from the ground."
>
> . . . .
>
> In sum, the buydown portions of the settlement payments at issue in this case have a sufficient nexus with production to make them royalty bearing. . . . No royalties were due when the settlement payment was made, because there had been no production, but when the gas was produced and purchased at the reduced price, the buydown settlement payment was transformed into a payment for gas produced.
>
> . . . .
>
> Where a purchaser has paid a settlement amount for the purpose of reducing the price of gas taken in the future, when that future gas is produced and sold to that purchaser at the reduced price the portion of the settlement payment attributable to obtaining the reduced price becomes royalty bearing. The fact that a purchaser receives a reduced price on gas the purchaser previously contracted to take at a higher price constitutes a nexus with production.

*Chevron,* 254 F.Supp.2d at 110–115 (citations omitted).

The MSTC argues that the same result occurs with severance taxes. That is, the MSTC contends that the Debtor's obligation to pay severance tax is based upon value of the gas at the point of production; that value is synonymous with sales prices;

and, that severance tax is due on the full value of gas produced, including all elements of value paid whether by purchase, settlement or otherwise.

■ Having considered the foregoing authorities presented by the parties, the Court again takes note of the fact that the severance tax statute simply does not address the issue of whether buy down payments are subject to severance tax. Nor has the MSTC adopted any rules or regulations governing severance tax with regard to "sour" gas production. Therefore, the Court examined Mississippi and Fifth Circuit case law. Yet, as neither conclusively resolves the issue, the Court carefully considered case law from other jurisdictions for further guidance.

To that end, the Court is persuaded by the cases discussed in detail above that the portion of the $79,000,000 buy down payment which is attributable to gas that was actually severed from the ground did, in fact, act as a prepayment for that amount of gas. The Court, reminded by *Shoshone Indian Tribe v. U.S.*, 58 Fed.Cl. at 86, discussed *supra*, to examine the underlying economic reality of the settlement payment at issue, concludes that the economic reality of the $79,000,000 buy down payment underlying the case at bar is that the amount of the payment accurately reflects the price differential between the long-term contract price for gas and the buy down amendment price for gas, and that the payment was made in advance for gas which was anticipated to be, and which ultimately was produced. Moreover, the Court concurs with the reasoning in the *Chevron v. U.S. Dept. of Interior* case that even where the settlement payment is denominated as nonrecoupable, "[t]he relevant question ... is whether or not the funds making up the payment actually pay for any gas severed from the ground." *Chevron*, 254 F.Supp.2d at 111. In the case currently before the Court, gas was ultimately severed from the ground at the buy down price.

The Court further observes that like the federal statute in *In re Century Offshore Mgmt. Corp.*, 111 F.3d at 446, which provided that royalty be paid on "the value of production," the Mississippi statute levies severance tax "measured by the value of the gas produced." The Mississippi statute further defines that "value" as the sale price, or market value, at the mouth of the well. It is undisputed that the gas produced from the Thomasville field has no market value at the mouth of the well and that its "value" is determined by the "work back method" discussed in detail below. Yet, as noted earlier in this opinion, that "value" has long been interpreted to be comprised of the "total receipts" obtained by the producer. *See 3300 Corp. v. Marx*, 633 So.2d 1028, 1030 (Miss.1994) (MSTC has a "long standing policy of charging severance taxes on the total receipts by a natural gas producer."). Similarly, the courts in both *Century Offshore* and *Yates v. Powell*, 98 F.3d at 1236, determined that the overall value, i.e., the total receipts, of the gas produced in those cases included the lump sum settlement payments from buy down contracts. Based upon these considerations, it is this Court's opinion that the overall value of the gas produced by the Debtor should include the appropriate portion of the buy down payment attributable to gas which was actually produced.

Simply put, then, the foregoing cases persuade the Court that the portion of the $79,000,000 buy down payment which is attributable to the approximate amount of five Bcf of gas which was ultimately severed from the ground under the buy down amendment did, in fact, act as a prepayment for that amount of gas and should be subject to severance tax.

### 3. The Five Year Allocation

The $8,674,200 assessment also is based on the MSTC's position that the $79,000,000 payment made under the buy down agreement represented a prepayment for gas to be taken over the five year period in which SoNat was obligated under the amended gas contract to buy gas at $3.75 per Mcf. Accordingly, Lynn Wright, the MSTC auditor, calculated the $8,674,200 assessment by simply allocating the entire $79,000,000 payment made to the Debtor and its partners over a five year period and calculated the severance tax deficiency annually on each allocated amount. More specifically, she prorated the severance taxes over the five year period from December 1, 1994, through December 31, 1998, in an equal amount of $948,000 for each year, together with a penalty of $94,800 for each year and interest computed on each year separately at the rate of 1% per month. The total assessment was thus computed as follows:

| | |
|---|---|
| Deficiency or additional tax due: | $4,740,000 |
| Penalty: | 474,000 |
| Interest: | 3,460,200 |
| Total Assessment: | $8,674,200 |

The MSTC admitted that the auditor made no attempt to associate the payment made under the buy down agreement with the production of gas, and instead computed the five year allocation because she was instructed to do so by her supervisor, Carl Carlisle, and because the five year allocation was the fairest approach for the Debtor. She did not attempt to account for gas volumes actually produced each month during the twenty-nine months that the buy down amendment was in effect.

Oscar Hartman, the MSTC's expert who is a CPA and an oil and gas contract litigation consultant, offered the opinion that the five year allocation was proper even though he knew that the auditor made no effort to associate the allocation with actual monthly production or severance of gas. He testified that the MSTC's five year allocation methodology "was one way to do it" but that "any other fair and equitable method that would be consistently applied that would allocate it over that [five year] period" would be acceptable. (Trial Tr. vol. 3, 187, Aug. 25, 2004). He thus offered four alternatives for allocating the purported prepayment for the purpose of assessing severance tax: (1) allocate over five years; (2) allocate over two and one-half years up to the buyout; (3) allocate to the approximate amount of five Bcf that were reduced in price; or (4) use the eleven Bcf limitation on the $3.75 price as a basis for determining per unit value.

The Debtor's expert, Lester Herrington, a former MSTC Deputy Commissioner and career employee of the MSTC with extensive experience in the area of tax audits as both an auditor and a supervisor, disagreed with Hartman on the alternative methods of determining or allocating value. Herrington emphasized that in order to determine severance tax, value must be determined within the confines of the statute. Additionally, another of the Debtor's experts, Emmitte Haddox, stated that the statute is clear that severance tax is reported when the gas is severed or produced. Haddox testified that the tax is absolutely tied to production and that Hartman's opinion is totally contrary to the undisputed requirement of severance as a predicate to taxation.

The Court is persuaded by the requirements of the severance tax statute and by the cases it has reviewed that the buy down payment should be assessed, as noted, only on the amount of gas actually produced each month and computed over the time period of actual production rather than allocated over five years. *See, e.g., Century Offshore,* 111 F.3d at 450 ("Now that this gas has been produced and delivered to Enron, royalty payments are due,

not merely on the price Enron ultimately paid, but on that price plus the amount of the lump sum payment allocable to the gas ultimately taken."); *Yates,* 98 F.3d at 1236 (royalty payable on both "(1) the proceeds obtained by the lessee from the sale of gas at the bought-down price; and (2) a commensurate portion of the settlement proceeds that is attributable to price reductions applicable to future production under the renegotiated gas sales agreement as production occurs."); *Chevron,* 254 F.Supp.2d at 115 ("[W]hen that future gas is produced and sold to that purchaser at the reduced price[,] the portion of the settlement attributable to obtaining the reduced price becomes royalty bearing."); *Shoshone,* 58 Fed.Cl. at 87 ("[T]he portion of a settlement attributable to a buy-down arrangement is royalty-bearing when the future production occurs.").

In summary, the Court finds that the six percent severance tax should be assessed on the actual monthly production (which should total approximately five Bcf) multiplied by $7.25 (the difference between the original contract price of $11.00 per Mcf and the buy down price of $3.75 per Mcf) for the twenty-nine months from January 1, 1994, through June 1, 1996 (time of actual production following the buy down amendment).

### 4. Is the Debtor Responsible for Payment of the Entire Amount of Severance Tax Due?

The MSTC assessed the entire amount of its claim for severance taxes arising from the buy down agreement against the Debtor as the "operator" of the field. The MSTC takes the position that the operator is liable for the entire amount of severance tax due under § 27–25–707. Section 27–25–707 states as follows:

§ 27–25–707. Payment of tax; persons liable; lien.

(1) The tax hereby imposed is levied upon the producers of such gas in the proportion of their ownership at the time of severance, but except as otherwise herein provided, shall be paid by the person in charge of the production operations, who is hereby authorized, empowered and required to deduct from any amount due to producers of such production at the time of severance the proportionate amount of the tax herein levied before making payments to such producer. Said tax shall become due and payable as provided by this article, and such tax shall constitute a first lien upon the property from which the gas was produced. In the event the person in charge of production operations fails to pay the tax, then the commissioner shall proceed against the producer to collect the tax in accordance with the provisions made for the collection of delinquent taxes by the Mississippi Sales Tax Law.

(2) When any person in charge of the production operations shall sell the gas produced by him to any person under contracts requiring such purchaser to pay all owners of such gas direct, then the person in charge of the production operations may not be required to deduct the tax herein levied, but in which event such deduction shall be made by the purchaser before making payments to each owner of such gas, and the purchaser in that case shall account for the tax; *provided that nothing herein shall be construed as releasing the person in charge of production operations from liability for the payment of said tax.*

(4) Every person in charge of production operations by which gas is severed from the soil or water in this state, who fails to deduct and withhold, as required herein, the amount of tax from sale or purchase price, when such gas is sold or

purchased under contract or agreement, or on the open market, or otherwise, shall be liable to the state for the full amount of taxes, interest, and penalties which should have been deducted, withheld and remitted to the state, and the commissioner shall proceed to collect the tax from the person in charge of production operations, under the provisions of this article, as if he were the producer of gas.

Miss.Code Ann. § 27–25–707(1), (2), (4) (emphasis added).

The Debtor contends that although § 27–25–707 levies severance tax on producers, subsection (2) also provides that the operator is not liable where the contracts require a purchaser to pay the owners of the gas direct. The Debtor further asserts that if the $79,000,000 payment was indeed a prepayment for gas, the MSTC's assessment should have been against each separate owner for its share of the payment. Accordingly, the Debtor could only be responsible for the part of the $79,000,000 payment that it actually received, which was $38,967,301.

The Court observes that § 27–25–707(2) provides that "nothing herein shall be construed as releasing the person in charge of production operations from liability for the payment of said tax." Accordingly, the Court finds that despite the fact that So-Nat paid each of the working interest owners separately, pursuant to the statute, the Debtor is responsible for payment of all severance tax due, calculated as instructed by the Court *supra*, whatever amount that is ultimately determined to be.

### B. THE PROCESSING FEE DEDUCTION

The Court will next address the second issue presented by the parties which is what deductions from the sales price of the gas, for severance taxes purposes, the Debtor is entitled to take for processing the "sour" gas. The MSTC conducted a severance tax audit of the Debtor regarding the gas processing fee deductions it took for the period of May 1, 1999, through May 31, 2002. The audit on the gas processing fee was conducted by Lynn Wright in the Debtor's business offices in Dallas, Texas, pursuant to a certified "statute" letter. The MSTC thereafter issued its audit report on August 6, 2002, reflecting a severance tax deficiency of $2,397,014 through May 31, 2002. The deficiency resulted from the MSTC's disallowance of the Debtor's deduction for capital recovery costs as well as its disallowance of what it deemed a "double deduction" for plant fuel. As noted previously, the MSTC has filed a number of amendments to its proof of claim as well as a motion seeking additional amounts which have accrued since the bankruptcy filing on September 20, 2002. The Debtor contends that the MSTC's assessment is invalid because it is inconsistent with Mississippi severance tax law and moreover, because the Debtor is properly using the processing fee approved for the Shell plant by the United States Court of Appeals for the Fifth Circuit in *Piney Woods Country Life School v. Shell Oil Co.*, 726 F.2d 225 (5th Cir.1984).

As mentioned previously, Mississippi assesses severance tax on natural gas based on the value of the gas at the mouth of the well, as set forth in the following statutes:

§ 27–25–701. Definitions.

(d) "Value" means the sale price, or market value, at the mouth of the well. If the gas is exchanged for something other than cash, or if there is no sale at the time of severance, or if the relation between the buyer and the seller is such that the consideration paid, if any, is not indicative of the true value or market price, then the commissioner shall determine the value of the gas subject to tax,

considering the sale price for cash of gas of like quality in the same or nearest gas-producing field.

§ 27–25–703. Privilege tax levied; exemptions.

(1) Except as otherwise provided herein, there is hereby levied, to be collected hereafter, as provided herein, annual privilege taxes upon every person engaging or continuing within this state in the business of producing, or severing gas, as defined here, from below the soil or water for sale, transport, storage, profit or for commercial use. The amount of such tax shall be measured by the value of the gas produced and shall be levied and assessed at a rate of six percent (6%) of the value thereof at the point of production, except as otherwise provided in subsection (4) of this section.

(2) The tax is hereby levied upon the entire production in this state, regardless of the place of sale or to whom sold or by whom used, .... The tax shall accrue at the time the gas is produced or severed from the soil or water, and in its natural, unrefined or unmanufactured state.

Miss.Code Ann. § 27–25–701(d); § 27–25–703(1),(2).

Also as noted previously, in the unusual case at hand, the "sour" gas has no market value at the mouth of the well and must be processed to create a marketable product. Accordingly, there is no sales price or market value at the mouth of the well as anticipated by the statute. The parties agree that there are, nonetheless, two methods which can be used to determine the value of "sour" gas at the mouth of the well. One method, expressly provided for by § 27–25–701(d), is to consider the "sales price for cash of gas of like quality in the same or nearest gas-producing field." The other method is to "work back" to a value at the mouth of the well by deducting

processing costs from the sales revenues received for the gas.

### 1. Value at the Mouth of the Well as Measured by Other Fields

Mississippi law expressly provides that in defining value for severance tax purposes, "if there is no sale at the time of severance, ... then the commissioner shall determine the value of the gas subject to tax, considering the sale price for cash of gas of like quality in the same or nearest gas-producing field." Miss.Code Ann. § 27–25–701(d). The MSTC admittedly did not perform any studies for comparison purposes, instead calculating the severance tax by using the "work back" method discussed *infra*.

The Debtor, however, did present at trial comparable field evidence which was compiled by Richard Jones, an expert in the field of petroleum engineering. Jones studied two comparable plants in East Texas, the Edgewood plant and the Eustace plant. Regarding the similarities in the fields, Jones explained, "The Edgewood plant is located about 60 miles [sic] of Dallas. It's in northeastern Texas. It handles gas that has approximately 35 percent hydrogen sulfide, which is directly comparable to Pursue." (Trial Tr. vol. 5, 91, Oct. 28, 2004). Jones further explained, "The Eustice [sic] plant is located further into the corner or [sic] northeast Texas. It's a short distance, maybe 40 miles, southwest of Texarkana. It, again, is a plant designed to process roughly 70 million cubic fee a day of inlet gas. And its gas is almost identical to the Pursue and the Edgewood plant." (Trial Tr. vol. 5, 92–93, Oct. 28, 2004). Jones further noted that at both plants "the plant operator owned part of the production behind the plant. There was a third party gas into it, as the case is with Pursue." (Trial Tr. vol. 5, 95, Oct. 28, 2004).

The evidence presented at trial also established that like the gas produced from the Thomasville field, the gas produced from the comparable fields is valued by deducting actual expenses and a processing fee from the sales price of the gas. Considering the reasonableness of the gas processing fee charged by the Debtor in comparison to the processing fee charged by the Edgewood and Eustace plants, Jones testified that "[b]y comparison to other plants that are nearly identical to them, [the Debtor's processing fee is] substantially less than anyone else I could find in the industry." (Trial Tr. vol. 5, 100, Oct. 28, 2004). Jones further testified,

> [T]here are several things that are considered [in determining a reasonable processing fee]. I think you have to take into account how long you think you can run the plant. In this case, though, in my opinion, the single thing that's most important is the risk. I mean, you've got a particular kind of gas here that—most people wouldn't venture into this kind of risk. It's very high.

(Trial Tr. vol 5, 91, Oct. 28, 2004). He also stated, "I think it's pretty obvious … that … what they're charging on a dollar per MCF basis, they're under what I was able to identify as industry comparisons. I think they're more than reasonable. I think they're understated." (Trial Tr. vol. 5, 94, Oct. 28, 2004). Thus, Jones opined that the Debtor's gas processing fee, compared to similar fields, is lower than the industry norm.

While the evidence presented by the Debtor on comparable fields is of some import, the Court again observes that the severance statute simply was not adopted with "sour" gas in mind. Thus, "[c]ompletely comparable sales are not likely to be found." *Piney Woods Country Life School v. Shell Oil Co.*, 726 F.2d 225, 239 (5th Cir.1984). Moreover, the parties agree that value at the mouth of the well also may be established by the "work back" method discussed below.

## 2. Value at the Mouth of the Well as Measured by the Work Back Method

Although the statute itself does not provide any deductions for processing costs in calculating severance tax, nor does the MSTC have any written policies or regulations regarding severance tax calculations, the parties agree that "value at the mouth of the well" can be established by the so-called "work back" method. The parties further agree that the "work back" method of determining the value of the "sour" gas at the mouth of the well entails deducting the costs incurred in processing the gas from the sales price of the gas. The parties disagree, however, on just what comprises those processing costs.

The MSTC takes the position that it has historically interpreted the statute to allow a taxpayer to deduct from sales revenues only the reasonable, direct operating costs of the processing plant. Kathy Waterbury, the MSTC corporate representative at trial, testified that those costs would normally include such items as capital expenses depreciated over their useful life and fuel used to operate the gas processing plant. In this case, however, for the reasons discussed *infra*, the auditor disallowed all of the Debtor's capital expenses for the audit period as well as what it deemed a "double deduction" for plant fuel.

The Debtor, on the other hand, contends that it is entitled to determine the value of the "sour" gas at the mouth of the well by using a certain gas processing fee formula which incorporates not only a particular capital costs basis and an allowance for plant fuel, but also a profit element to compensate the Debtor for the risk it in-

curs in processing the "sour" gas.[14] The Debtor further asserts that the gas processing fee formula it uses in calculating its severance taxes has been approved specifically for the Shell plant by the United States Court of Appeals for the Fifth Circuit. The Debtor therefore argues not only that it is entitled to use the formula approved by the Fifth Circuit but also that it has properly calculated and paid its severance taxes in accordance with it.

More specifically, the Debtor asserts that it is entitled to determine value at the mouth of the well for severance tax purposes by utilizing the "work back" gas processing fee formula set forth in the line of cases beginning with *Piney Woods Country Life School v. Shell Oil Co.*, 539 F.Supp. 957 (S.D.Miss.1982). In that earliest case, royalty owners in the Thomasville and other fields alleged that Shell was improperly charging them for processing their share of "sour" gas. The district court discussed how Shell had "devised an allocation and accounting procedure which insures that each well is properly credited for its share of the production while reimbursing the plant for costs associated with processing the gas." *Id.* at 963. The court went on to say, "This latter function is accomplished by equations which ... are designed to accommodate such variables as the costs of operating the gas treatment ... facilities, Shell's capital investment, the production rate and revenue received from production, while simulta-

neously recovering the cost of processing the gas...." *Id.* at 963–64. The court then analyzed in detail the factors comprising the gas processing formula. *Id.* at 964–65. In short, the costs were more particularly described as including "not only the actual operating costs of the plant in the form of expenses for payroll, materials, insurance, taxes, etc., but also reimbursement of the capital investment in the treating plant, together with a return on that investment." *Id.* at 964. The district court found that the royalty owners and Shell should bear proportionately the costs of enhancing, i.e., processing, the value of the "sour" gas.

On appeal, the United States Court of Appeals for the Fifth Circuit stated in *Piney Woods Country Life School v. Shell Oil Co.*, 726 F.2d 225 (5th Cir.1984), "Market value at the well means market value before processing and transportation." *Id.* at 231. In determining market value at the well, one method the court approved was "the actual sale price of the gas less costs." *Id.* at 239. The court recognized that "Shell has passed on to the royalty owners a proportion of these costs, as determined by complex formulas that compensate Shell for expenses and capital investment." *Id.* at 240. And the court agreed that the royalty owners "may be charged with processing costs, by which we mean all expenses, subsequent to production, relating to the processing, transportation, and marketing of gas...." *Id.*

---

14. Frankly, the Court had some difficulty in analyzing the arguments of the parties as to whether the Debtor should be allowed to include profit as an element of the gas processing fee, primarily because the parties variously characterized the profit element as a "risk fee" or a "capital fee." In any event, the Court observes that the *Piney Woods* line of cases discussed hereinafter expressly allowed a profit element as part of the gas processing formula. *See Piney Woods Country Life School v. Shell Oil Co.*, 539 F.Supp. 957, 964 (S.D.Miss.1982) (processing costs include "reimbursement of the capital investment in the treating plant, together with a return on that investment."). In that the Court is deciding that the Debtor is entitled to compute the value of "sour" gas at the mouth of the well by using the processing fee formula set forth in the *Piney Woods* line of cases, albeit subject to the limitations set forth in this opinion, the Court leaves the profit element of the processing fee formula undisturbed.

at 240. Finally, the court noted that the processing costs must be reasonable. *Id.* at 241. Subsequently, the Fifth Circuit acknowledged that the processing costs charged by Shell were reasonable. *See Piney Woods Country Life School v. Shell Oil Co.,* 905 F.2d 840, 843 (5th Cir.1990).

Thus, the Fifth Circuit determined that for purposes of royalty computations from the Thomasville field, value at the mouth of the well should be established by deducting from the sales price of gas the capital investment, a return on that investment, and costs of operating the plant as well as gathering, delivering and transporting the refined product. Although the *Piney Woods* cases considered the value at the mouth of the well issue in terms of royalty payments, this Court is persuaded that the line of *Piney Woods* cases indeed sets forth a gas processing fee formula for determining value at the mouth of the well to which this Court may adhere for purposes of determining value at the mouth of the well for severance tax purposes. Consequently, the Court finds that the Debtor should be allowed to utilize the same gas processing fee formula, specifically as set forth in the *Piney Woods* cases, for purposes of determining value at the mouth of the well for severance tax calculations, subject to the following limitations.

**a. Capital Expenses**

As noted, for severance tax purposes, the MSTC objects to the Debtor's deduction from the sales price of the gas any costs other than direct operating costs. The Court, having already determined that the Debtor is entitled to determine value at the mouth of the well by utilizing the "work back" gas processing fee formula set forth in the *Piney Woods* cases, obviously rejects the MSTC's position. Yet, the Court is persuaded that the MSTC is correct in its contention that the Debtor should not be allowed to use Shell's capital investment figure of $41,000,000 as an element of the formula.

That is, in establishing the "work back" formula to determine value at the mouth of well, the *Piney Woods* courts used a gas processing fee calculated on the basis of the $41,000,000 capital investment Shell had made in the Thomasville field. As noted earlier in this opinion, when the Debtor acquired the Shell plant, it adopted the *Piney Woods* formula as its own. The Debtor thus mechanically assumed use of Shell's capital costs investment of $41,000,000 within that formula, rather than employing its own actual capital costs. The Debtor takes the position that not only is the use of Shell's capital investment amount immaterial to the calculation of the processing fee, but also that it is not at liberty to alter parts of the formula and must apply it precisely as approved by the Fifth Circuit.

The Debtor asserts that its experts demonstrated at trial that recovery of capital investment should have no impact on the processing fee. To that end, the Debtor presented the expert testimony of CPA Emmittee Haddox. Haddox testified that in his experience, the recovery of capital investment had no impact on the processing fee. He stated that "as assets are depreciated, that has no impact on the fee at all or the addition or replacement of motors and pumps and that sort of thing has no impact on the fee." (Trial Tr. vol. 5, 184, Oct. 28, 2004). Rather, in his experience, the management of the company determined what was a reasonable processing fee to keep the plant profitable.

Haddox further maintained that the MSTC's purported policy of allowing straight line depreciation is not a proper accounting approach. According to Haddox, straight line depreciation is a financial reporting and income tax concept improp-

erly applied to severance tax. "[T]o bring that concept [depreciation] into severance tax is apples and oranges. They don't mix." (Trial Tr. vol. 5, 185, Oct. 28, 2004). He further stated, "Depreciation really is not a factor, because you're not determining net income or anything of that nature in conjunction with severance tax." (Trial Tr. vol. 5, 187, Oct. 28, 2004).

Additionally, Richard Jones testified for the Debtor that in his experience with gas plants, processing fees are never reduced after recoupment of investment but continue for the life of the plant. He also testified that both of the comparable plants he examined had gone through three or four changes of ownership but that the processing fee did not change unless it increased. In Jones' opinion, the *Piney Woods* formula adopted by the Debtor is appropriate.

The MSTC, however, objects to the Debtor's use of Shell's capital investment amount. The MSTC takes the position that the Debtor should use its own actual capital expenditures when calculating the gas processing fee.[15] Lynn Wright, the MSTC auditor, admitted that she was not aware that the MSTC allowed any capital expenditures to be depreciated or amortized over the useful life of the property[16] and that accordingly, she did not allow any such depreciation in the severance tax audit. However, the MSTC takes the position that it is irrelevant that the auditor disallowed any capital expenditure depreciation on the gas processing audit as the Debtor was not entitled to that depreciation in any event because it had already fully recovered its own actual capital costs.

In other words, while the MSTC acknowledges that it usually allows a taxpayer to amortize capital expenses over the useful life of the property, in this particular audit it disallowed all of the Debtor's capital expenses because the Debtor had overcharged for capital expenditures in earlier years to such an extent that all of its capital costs in the Shell plant had been recovered prior to the audit period.

While the Court is persuaded that the *Piney Woods* cases set forth a gas processing fee formula which may be utilized by the Debtor for determining the value of "sour" gas at the mouth of the well for severance tax purposes, the Court is not persuaded that those cases compel the Debtor's use of Shell's capital cost expenditures within the gas processing fee formula. Rather, the Court is persuaded that while the Debtor should be allowed to use the gas processing fee formula set forth in the *Piney Woods* cases, the formula should be subject to the insertion of its own, actual capital expenditures in place of Shell's initial capital investment of $41,000,000. *See Atlantic Richfield Co. v. The Farm Credit Bank of Wichita*, 226 F.3d 1138, 1155 (10th Cir.2000) ("To permit ARCO to deduct expenses for capital contributions it never made would be both nonsensical and unfair."); 30 C.F.R. § 206.159(b)(1), (2) (for federal gas processing fees where "the lessee performs processing for itself, the processing allowance will be based upon the lessee's reasonable actual costs ... including operating and maintenance expenses, overhead,

---

15. The Debtor asserts that its capital investment in the Thomasville field is in excess of $73,000,000. However, the Debtor incorporates into that figure the $53,000,000 cost to build the Pursue plant, the $14,943,000 to purchase the Shell plant, and all improvements made to the Shell plant since the purchase, which total upwards of $6,000,000.

The Court finds that the evidence demonstrates that the Debtor's actual capital investment in the Shell plant was $20,633,513, comprised of the purchase price for the Shell plant together with improvements.

16. The parties agree that the useful life of the Shell plant is ten years.

and ... depreciation and a return on undepreciated capital investment...."").

To that end, the Court further finds that the evidence demonstrates that the Debtor's actual capital expenditures for the Shell plant were $19,633,513. The testimony at trial established that the Debtor spent $20,633,513 in purchasing and improving the Shell plant. From that amount, the testimony further established that in connection with the buy out agreement, the Debtor received from SoNat a reimbursement of $1,000,000 toward those capital costs. Thus, although the $1,000,000 was paid to the Debtor in accordance with the buy out and therefore was not subject to severance taxes as part of that agreement, the economic reality of the transaction was that the Debtor was reimbursed $1,000,000 against its overall capital investment in the Shell plant. Accordingly, the Debtor's actual capital expenses in the Shell plant were $19,633,513.

The Court therefore finds that the Debtor is entitled to utilize the gas processing fee formula set forth in the *Piney Woods* line of cases subject to the insertion of its own capital costs of $19,633,513 for Shell's initial capital investment of $41,000,000.

### b. Plant Fuel

Moreover, the Court is persuaded that the gas processing formula as set forth in *Piney Woods* should also be subject to the Debtor's use of only one deduction for plant fuel from its severance taxes. According to the evidence presented at trial, the MSTC normally allows an exemption from severance tax for gas used as fuel to operate a gas processing plant. The Debtor claimed that plant fuel exemption on its severance taxes. However, the testimony established that the *Piney Woods* gas processing formula also includes as one of its components a deduction for the gas used to operate the Pursue plant. Thus, the

Debtor took one deduction for plant fuel through the gas processing formula and a second deduction via the exemption allowed by the MSTC. The MSTC objects to what it calls the Debtor's "double deduction."

The Debtor, on the other hand, takes the position that the gas processing fee, including the plant fuel component, was set forth in the *Piney Woods* cases and that accordingly, it is entitled to and in fact, is required to use the formula specifically as approved by the Fifth Circuit. The Debtor further contends that the MSTC allows a separate exemption for plant fuel expense, which it is entitled to and does take. To that end, the Debtor presented the testimony of its former audit manager, Alan Baine, and one of its experts, Emmitte Haddox, who both testified that the deductions do not constitute a "double deduction." Baine explained that the Debtor's severance tax returns, on which the Debtor took the plant fuel deduction as part of the gas processing formula and also took the separate exemption for plant fuel allowed by the MSTC, were proper because "both are allowed by law ... that's the way you do it." (Trial Tr. vol. 5, 51, Oct. 28, 2004). Haddox testified more specifically:

Well, there are two different items. One is plant fuel is [sic] allowed as an exemption by the State Tax Commission. I believe [in] 1981, the board of review specifically said that plant fuel used in the plant is exempt from severance tax.

Secondly, the federal courts in the *Piney Woods* case include plant fuel as a part of determining that fee. That fee was determined including that to be a processing fee that should be deducted from the sale price to arrive at value at the mouth of the well. So the fact that it's included in the *Piney Woods* formula

is under that guidance. And the fact that it's an exemption was from the Board of Review.

(Trial Tr. vol. 5, 182, Oct. 28, 2004).

Having considered the evidence, the Court is persuaded that the Debtor should be allowed to continue to use its plant fuel expense deduction as part of its gas processing formula as set forth in *Piney Woods* because it is an actual expense incurred by the Debtor in processing the gas. The Court is further persuaded that the Debtor should not be allowed to take an additional exemption for the same plant fuel.

## VI.

Section 27–65–39 provides for a penalty of 10% of the unpaid amount of severance tax, and interest at the rate of 1 % per month. *See also* Miss.Code Ann. § 27–25–717 (applying administrative provisions of Mississippi's sales tax law to penalties and interest levied under the severance tax law). The Court finds that, in accordance with the statute, the MSTC is entitled to assess penalties and interest on its claim regarding the buy down agreement, calculated as set forth *supra.* The Court further finds that in accordance with the statute, the MSTC is entitled to assess penalties and interest on its claim regarding the gas processing fee, calculated as set forth *supra.*

## CONCLUSION

Pursuant to Federal Rule of Bankruptcy Procedure 3002(a), the MSTC filed its proof of claim and amendments thereto, as well as its motion for payment of administrative expenses, relating to severance tax assessments it made against the Debtor. In accordance with Federal Rule of Bank-

ruptcy Procedure 3001(f), the proof of claim and amendments thereto constituted prima facie evidence of the validity and amount of the MSTC's claim. The Debtor and the UCC filed objections to the proof of claim, the amendments thereto, and the motion, and the issues came before this Court for trial. The MSTC had the burden of proving the amount of its claim by a preponderance of the evidence. The evidence presented at trial has persuaded the Court that the Debtor's and the UCC's objections are well taken in part and should be granted in part and are not well taken in part and should be denied in part.

The evidence demonstrated that the MSTC's assessment on the buy down agreement is not barred by the statute of limitations. The evidence further established that the six percent severance tax should be assessed on the actual monthly production (which should total approximately five Bcf) multiplied by $7.25 (the difference between the original contract price of $11.00 per Mcf and the buy down price of $3.75 per Mcf) for the twenty-nine months from January 1, 1994, through June 1, 1996, (time of actual production following the buy down amendment).[17] Consequently, the MSTC should be allowed a claim for severance taxes in regard to the buy down agreement, calculated in the manner set forth in this opinion, together with any appropriate penalties and interest, and apportioned in accordance with the Bankruptcy Code into a priority tax claim to the extent provided by 11 U.S.C. § 507(a)(8), a general unsecured claim, and an administrative claim to the extent provided by 11 U.S.C § 503(b)(1)(B). Furthermore, the evidence demonstrated that the Debtor, as operator of the Shell plant, is liable for

---

17. In the Court's estimation, the six percent severance tax will be assessed over the twen-ty-nine months on a recalculated amount of approximately $36,250,000.

payment of all severance tax due in regard to the buy down agreement.

Moreover, the evidence demonstrated that the MSTC's assessment regarding the gas processing fee should be calculated using the formula set forth in the *Piney Woods* cases but inserting in the formula the capital costs amount of $19,633,513 (Debtor's actual capital investment in the Shell plant less the $1,000,000 reimbursement) rather than the $41,000,000 figure used by Shell, and by permitting the Debtor to take the plant fuel expense as set forth in the gas processing fee formula but not permitting the Debtor to take the separate plant fuel exemption as usually allowed by the MSTC. Consequently, the MSTC should be allowed a claim for severance taxes in regard to the gas processing fee charged by the Debtor, calculated in the manner set forth in this opinion, together with any appropriate penalties and interest, and apportioned in accordance with the Bankruptcy Code into a priority tax claim to the extent provided by 11 U.S.C. § 507(a)(8), a general unsecured claim, and an administrative claim to the extent provided by 11 U.S.C. § 503(b)(1)(B).

A separate judgment will be entered in accordance with Federal Rule of Bankruptcy Procedure 9021.

**SO ORDERED.**